UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

DEAUNDRA PATTERSON,                )
                                   )
                Plaintiff,         )
                                   )
        v.                         )        No. 2:20-cv-00431-JRS-DLP
                                   )
WEXFORD HEALTH SERVICES, et al.    )
                                   )
                Defendants.        )

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Deaundra Patterson, an inmate at Wabash Valley Correctional Facility ("WVCF"), alleges in this lawsuit that the defendants have provided him with constitutionally inadequate medical care for (1) Gastroesophageal Reflux Disease ("GERD"); (2) Dermatofibroma; and (3) a foreign particle in his eye.[1]  The defendants have filed a motion for summary judgment. For the reasons below, the motion is **GRANTED IN PART AND DENIED IN PART**.

### I. Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond

---

[1] Mr. Patterson also alleges facts in his response to the motion for summary judgment about clindamycin medication and his inhaler, but no claims based on these medications were raised in the complaint or identified in the Court's screening order. Dkt. 8.

the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

## II. Facts and Background

Because the defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### A. The Defendants

#### 1. Barbara Riggs

Barbara Riggs was employed by Wexford of Indiana, LLC, as a nurse at WVCF. Dkt. 46-2 ¶ 2. Nurse Riggs reviews healthcare requests slips submitted by inmates and performs initial assessments, among other things. Dkt. 46-2 ¶ 4. She does not have the authority to order specific care and treatment for patients. *Id.* In addition, Nurse Riggs did not fill prescription orders as she did not work in the pharmacy during times relevant to Mr. Patterson's complaint. *Id.* She can only refer inmates to the provider and does not schedule appointments.[2] *Id.* ¶ 6.

#### 2. Lesa Wolfe

Lesa Wolfe works as a licensed practical nurse ("LPN") for Wexford at WVCF. Dkt. 46-3 ¶ 2. Nurse Wolfe is a pharmacy nurse, which means that she ensures all inmates' medication orders are current. *Id.* But she cannot renew orders for a number of medications, including GERD medications, because that must be done by the provider. *Id.*

---

[2] Mr. Patterson disputes Nurse Riggs's statement that she does not schedule appointments, but for support, he cites a response from Nurse Riggs to a healthcare request form stating that his appointment had been scheduled. Dkt. 2-1 at 24. This is insufficient to support Mr. Patterson's assertion that Nurse Riggs was responsible for scheduling the appointment.

Nurse Wolfe does not have the authority to order specific care and treatment for patients and she does not schedule patients for provider visits or examine them in nursing sick call. *Id.* ¶ 4. She may, however, administer medications to patients pursuant to physician orders. *Id.*

### 3. Cora Roberts

Cora Roberts works as a Certified Nursing Assistant ("CNA") at WVCF. Dkt. 46-4 ¶ 2. Ms. Roberts is the pharmacy technician at the facility, which involves checking in medications when they arrive to the facility and passing out medications to inmates, among other things. *Id.* Ms. Roberts does not have authority to order specific care and treatment for patients. *Id.* ¶ 4.

### 4. Amy Wright

Amy Wright, a registered nurse, was employed by Wexford as the Director of Nursing ("DON") at WVCF. Dkt. 46-1 ¶ 2. As the DON, Nurse Wright supervises registered nurses and licensed practical nurses at WVCF. *Id.* ¶ 4. She does not have authority to order specific treatment for inmates, but she may respond to healthcare request forms and assist in responding to inmate grievances. *Id.* ¶ 6.

### 5. Wexford of Indiana, LLC

Wexford provides healthcare to inmates pursuant to a contract with the Indiana Department of Correction ("IDOC"). *See* dkt. 46-1 ¶ 11. Under that contract, Wexford must abide by IDOC Health Care Services Directives. *Id.* Under those directives, inmate healthcare request forms must be collected daily and triaged. *Id.* If the health care request indicates that the inmate is experiencing symptoms, a nurse must perform an assessment and an appointment cannot be scheduled with a doctor without a nursing assessment. *Id.* IDOC policy also provides that nursing staff are not permitted to refill medications unless the provider has ordered it. *Id.* ¶ 13. And, if inmates receive

medications as "keep on person" ("KOP"), they are required to request routine refills when their medication is running out. *Id.* ¶ 14.

### B. Mr. Patterson's Medical Care

Mr. Patterson was diagnosed with GERD in 2010 or 2011. Dkt. 60-1 at 1 ¶ 4. In September of 2017, Mr. Patterson's GERD medication was switched to Famotidine.[3] Dkt. 60-1 at 124-27.

#### 1. July 2018

Mr. Patterson expected to receive his Famotidine refill on July 14, 2018, and submitted two healthcare requests, on July 27 and 31, 2018, requesting it. Dkt. 60-1 at 202, 203. Nurse Wolfe responded to Mr. Patterson's first request on August 1, 2018, stating "it can only be filled when due…last filled 7/12/18-17 tabs it is just now able to be refilled." *Id.* at 203. She responded to his second request stating that it had been filled. *Id.* at 202. Mr. Patterson also filed an informal grievance stating that his Famotidine prescription was due for a refill on July 5, 2018. Nurse Wright responded "Pepcid Ordered 7/17/18. Will receive 8/3/18." Dkt. 2-1 at 11.

#### 2. January and February 2020

On January 14, 2020, Nurse Riggs saw Mr. Patterson after he submitted a healthcare request for concerns that Zantac caused cancer. Dkt. 46-5 at 11-13. Mr. Patterson also complained of fatigue, pain in various areas including his throat, stomach, side, and lymph nodes. *Id.* He further noted dark growths on his skin and requested a test to see if he had cancer. *Id.* Nurse Riggs examined him and found no evidence of any infection, but noted pea sized, dark, hard areas on his skin. *Id.* The physician also spoke to Mr. Patterson at this visit and referred him for labs and a skin

---

[3] Famotidine, generic for Pepcid, is a histamine-2 blocker used to treat GERD. Drugs.com, *Famotidine* https://www.drugs.com/famotidine.html#:~:text=Famotidine%20is%20a%20histamine%2D2,suc h%20as%20Zollinger%2DEllison%20syndrome (last visited March 21, 2022).

biopsy. *Id.* Mr. Patterson's labs were taken on March 20, 2020. Dkt. 46-5 at 2-3. He underwent the skin biopsy on March 27, 2020. *Id.* at 6.

Nurse Samantha Dawdy, who is not a defendant in this case, saw Mr. Patterson on January 25, 2020, for his concerns about a particle in his eye. Dkt. 46-5 at 9-10. She referred him to the doctor, who saw him on February 5, 2020, and prescribed Maxitrol eye drops.[4] Dkt. 46-5 at 17; dkt. 60-1 at 376. Mr. Patterson states that he verbally requested this medication from Nurse Wolfe several times. Dkt. 60-1 at 6 ¶ 39. He also states that Nurse Wolfe updated his medical records on February 27, 2020, to show the prescription, but did not provide it to him. Dkt. 60-1 at 7 ¶ 41; dkt. 60-1 at 57.

### 3. March and April 2020

Mr. Patterson submitted a healthcare request form on March 1, 2020, asking for a refill of his Famotidine prescription. Dkt. 2-1 at 13. Nurse Wolfe responded that there was no current order. *Id.* Mr. Patterson submitted another request on March 7, asking again for his Famotidine prescription. Dkt. 2-1 at 14. In that request, Mr. Patterson asks to have the doctor re-order or authorize the medication. *Id.* Nurse Wolfe responded that Mr. Patterson should sign up for nursing sick call and to purchase milk of magnesia or Prilosec from commissary. *Id.*

Mr. Patterson submitted a further request on March 7, 2020, stating that the labs that had been ordered in January had not been drawn yet and that he had not received the medications that the optometrist ordered. Dkt. 46-5 at 1. *Id.* Nurse Wright reviewed Mr. Patterson's medical records and responded on March 18, 2020. Dkt. 46-1 ¶ 7; dkt. 46-5 at 1. She informed Mr. Patterson that

---

[4] "Maxitrol … is a combination antibiotic and steroid medicine that is used to treat eye inflammation caused by uveitis, eye injury, radiation, chemical burns, or certain other conditions." Drugs.com, *Maxitrol (ophthalmic)*, https://www.drugs.com/mtm/maxitrol-ophthalmic.html (last visited Mar. 21, 2022).

his labs would be drawn soon and that the optometrist ordered the medications on March 11, 2020. *Id*.

On March 19, 2020, Nurse Riggs assessed Mr. Patterson in nurse sick call for complaints of pain and vomiting, and on his request for Famotidine for acid reflux. Dkt. 46-5 at 7-8. Nurse Riggs explained that when requests are received for reflux issues, commissary purchases are reviewed to ensure that the inmate is following a diet that does not aggravate reflux symptoms. *Id.* Because a review of Mr. Patterson's commissary purchases showed that he ordered foods that aggravated reflux, she encouraged him to refrain from ordering spicy foods, sweets, carbonation, and caffeine. *Id.*

Mr. Patterson saw Dr. Byrd on March 27, 2020, for the skin biopsy. Dkt. 60-1 at 52-54. Mr. Patterson spoke to Dr. Byrd about his GERD and Dr. Byrd prescribed Sucralfate.[5] Dkt. 60-1 at 3 ¶ 16. As a result of the biopsy, Mr. Patterson was diagnosed with dermatofibroma. Dkt. 60-1 at 6 ¶ 35; dkt. 2-1 at 26-27.

Mr. Patterson saw Dr. Naveen Rajoli on April 9, 2020, and Dr. Rajoli ordered Carafate[6] for his GERD. Dkt. 60-1 at 47. The medical record indicates that the prescription was for one tablet twice per day.[7] Dkt. 60-1 at 47.

Mr. Patterson spoke to Nurse Wolfe on April 13, 2020, and asked for his Sucralfate. Dkt. 60-1 ¶ 19. He also submitted a healthcare request. Dkt. 60-1 ¶ 20; dkt. 46-5 at 30. Nurse Wolfe

---

[5] Sucralfate is used to treat ulcers. *Sucralfate*, Drugs.com, https://www.drugs.com/mtm/sucralfate.html (last visited March 15, 2022).

[6] Carafate is the brand name of Sucralfate. *Carafate*, Drugs.com, https://www.drugs.com/carafate.html (last visited March 21, 2022).

[7] Mr. Patterson points to what appears to be a prescription form dated May 28, 2020, which he contends acknowledges that he was originally prescribed 120 tablets of Carafate. Dkt. 59 at 38; dkt. 2-1 at 34. But that form does not appear to reflect what Mr. Patterson was ordered in April of 2020 and therefore is insufficient to show what had been ordered at that time.

responded that his request had been filled. Dkt. 46-5 at 30. On April 15, 2020, Mr. Patterson received 30 Sucralfate tablets.[8] Dkt. 60-1 ¶ 21.

Mr. Patterson saw the optometrist again on April 15, 2020, and received a prescription for artificial tears and tobrex eye ointment.[9] Dkt. 60-1 at 7 ¶ 45; dkt. 60-1 at 43-44. Mr. Patterson states that the optometrist told him that his condition may have worsened because of the delay in providing his prescription. Dkt. 60-1 at 7 ¶ 46.

Mr. Patterson ran out of Sucralfate tablets on April 21, 2020, because he took them four times per day as he states he had been prescribed. Dkt. 60-1 at 4 ¶ 22. Mr. Patterson states that he told Nurse Wolfe this, and she told him that he should have received 60 tablets. *Id.*

Ms. Roberts responded to a health care request form that Mr. Patterson submitted on April 26, 2020, concerning his Carafate prescription. Dkt. 46-5 at 21. In the request, Mr. Patterson stated that he had received thirty tablets on April 14, 2020, but he was instructed to take four tablets daily. *Id.* After reviewing his medical records, Ms. Roberts responded that the order was for thirty tabs, one tab daily. *Id.*; dkt. 46-4 ¶ 7.

### 4. May and June 2020

Mr. Patterson submitted another request for a refill of his Carafate on May 7, 2020. Dkt. 2-1 at 20. Nurse Wolfe responded "filled 5/8/20" and provided him with 30 tablets. *Id.*; dkt. 59 at 6 ¶ 22.

On May 22, 2020, Nurse Riggs saw Mr. Patterson in sick call after he submitted a healthcare request form asking to be seen regarding his Carafate prescription, stating it did not

---

[8] Mr. Patterson contends that his Carafate prescription was to be refilled in 22 days, but the medical administration record he cites does not indicate when the medication would be refilled. *See* dkt. 60-1 at 237.
[9] Tobrex is used to treat bacterial eye infections. *Tobrex*, Drugs.com, https://www.drugs.com/mtm/tobrex.html (last visited March 21, 2022).

work and that he was not getting the correct quantity. Dkt. 46-5 at 4-5. Nurse Riggs educated him on proper nutrition and foods to avoid after she reviewed his commissary purchases. *Id.* Additionally, she sent an e-mail to the pharmacy regarding his medication concerns. Dkt. 46-9 at 2.

On May 25, 2020, Nurse Wolfe responded to Mr. Patterson's health care request in which Mr. Patterson stated that the provider prescribed Carafate four times per day and he was only given thirty tabs every twenty-three days. Dkt. 46-5 at 28. Nurse Wolfe reviewed his medical records and responded that the order was for one tab every day. *Id.*; dkt. 46-3 ¶ 10. Typical orders for GERD medication are for one or two tabs daily. Dkt. 46-3 ¶ 11. Four tabs per day is highly unusual, and Mr. Patterson's order did not include "qid/bid/tid" which would indicate any specifics for non-daily orders. *Id.* Mr. Patterson had signed for thirty tablets on May 12, 2020. Dkt. 46-5 ¶ 10; dkt. 60-1 at 234.

Mr. Patterson also requested a refill of his artificial tears and tobrex eye ointment on May 25, 2020. Dkt. 2-1 at 32. He states that these were due to be refilled on May 2 and 4, 2020. Dkt. 60 at 7 ¶ 47-48. But the medical record of the order for these medications indicates that the tobrex "stop date" was May 1, 2020, while the artificial tears stop date was October 11, 2020. Dkt. 60-1 at 43. Nurse Wolfe responded, "sent for." *Id.* Mr. Patterson received artificial tears, but not tobrex. Dkt. 60-1 at 7 ¶ 50.

On May 27, 2020, Nurse Riggs saw Mr. Patterson for a nurse visit. Dkt. 46-5 at 2-3. She assessed Mr. Patterson and reviewed his labs, which were normal. *Id.* Nurse Riggs also explained to Mr. Patterson that his biopsy showed lichen simplex, which "is a localized, well-circumscribed

area of thickened skin…resulting from repeated rubbing, itching, and scratching of the skin."[10]

She spoke with the provider about the biopsy and received no new orders. *Id.* Mr. Patterson states

that he told Nurse Riggs that he was experiencing itching and pain due to his skin condition. Dkt.

60-1 at 6 ¶ 36.

Ms. Roberts responded to another of Mr. Patterson's health care request forms on May 30,

2020. Dkt. 46-5 at 20. Mr. Patterson requested a Carafate refill, and Ms. Roberts responded that

Mr. Patterson could sign for it on June 2, 2020. *Id.* Mr. Patterson signed for one hundred and

twenty Carafate tablets on June 2, 2020, and sixty on June 25, 2020. Dkt. 46-5 at 24. That

prescription states "Take 1 tablet(s) by mouth four times a day…." Dkt. 2-1 at 34.

In June of 2020, Nurse Wright responded to the facility grievance specialist's request for

information on Mr. Patterson's grievance related to his labs, skin biopsy, and GERD medication.

Dkt. 46-1 ¶ 8; dkt 46-6 at 20. Nurse Wright reviewed Mr. Patterson's medical records and informed

the grievance office that Nurse Riggs saw Mr. Patterson on January 14, 2020, and spoke with Dr.

Byrd. *Id.* The biopsy completed on March 27, 2020, showed Lichen Simplex. *Id.* Pepcid remained

on back order and Carafate was provided in its place and Prilosec was available on commissary.

*Id.* Nurse Wright also stated that Mr. Patterson had been educated on commissary purchases on

March 19, 2020, but a review of his commissary showed that he was still purchasing foods that

could aggravate acid reflux. *Id.* Based on this information, the grievance specialist determined that

his care appeared to be appropriate. *Id.* at 10. Mr. Patterson appealed the decision, and his appeal

was denied. *Id.* at 1.

---

[10] WebMD, *Lichen Simplex Chronicus*,  https://www.webmd.com/skin-problems-and-treatments/picture-of-lichen-simplex-chronicus#:~:text=Lichen%20simplex%20chronicus%20(LSC)%20is,%2C%20contact%20dermatitis%2C%20or%20psoriasis (last visited March 21, 2022).

In late June, Ms. Roberts responded to another request from Mr. Patterson for a refill of his Carafate prescription. Dkt. 46-5 at 19. Ms. Roberts stated that his refill prescription was sent for, which means that the order was sent to the outside pharmacy to be filled. *Id.*; dkt. 46-4 ¶ 9. Mr. Patterson submitted another request for a refill of his Carafate on July 31, 2020. Dkt. 2-1 at 37. He states that he was due to receive his refill on July 8 but had not received it. Dkt. 59 at 9 ¶ 50. Nurse Wolfe responded that the prescription had been filled on July 30. Dkt. 2-1 at 37.

### III. Discussion

#### A. Deliberate Indifference Standard

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). However, "not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'" *Eagan v. Dempsey*, 987 F.3d 667, 688 (7th Cir. 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). "'To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 751 (7th Cir. 2021) (quoting *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc)).

The defendants do not dispute that Mr. Patterson's conditions constituted serious medical needs. But they argue that they were not deliberately indifferent to those needs. "The second element of deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Donald*

*v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations and citations omitted). A defendant must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (internal quotation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

"[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotations omitted). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford Health Sources, Inc.*, 609 F. App'x 861, 862 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

11

**B. Nurse Riggs**

Nurse Riggs saw Mr. Patterson several times for his complaints of skin lesions and GERD.

**1. Skin Condition**

Nurse Riggs examined Mr. Patterson on January 14, 2020, and noted pea sized, dark, hard areas on his skin. Dkt. 46-5 at 11-13. The doctor also spoke to Mr. Patterson at this visit and ordered labs and a skin biopsy. *Id.* Mr. Patterson underwent the skin biopsy on March 27, 2020. *Id.* at 6. The labs were taken on March 20, 2020. *Id.* at 2. Nurse Riggs saw Mr. Patterson again in May, after his biopsy had been taken. Dkt. 46-5 at 2-3. She explained to him that his biopsy showed lichen simplex and advised him she would follow up with the provider about the biopsy. *Id.* Nurse Riggs spoke with the provider about the biopsy and received no new orders. *Id.*

In other words, Nurse Riggs evaluated Mr. Patterson's skin condition, consulted with the doctor, and receiving no orders, provided no further treatment. Mr. Patterson argues that Nurse Riggs failed to promptly follow Dr. Byrd's orders for labs and a biopsy in January of 2020. Dkt. 59 at 7 ¶ 30-32. But Mr. Patterson has designated no evidence that Nurse Riggs was responsible for, or aware of, any delay in scheduling his appointment. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (a defendant in a § 1983 action can be held liable only for actions or admissions in which she personally participated).

Mr. Patterson also argues that he suffered itching and pain due to his skin condition and Nurse Riggs failed to address this. Dkt. 59 at 7 ¶ 34. But he does not dispute that Nurse Riggs spoke to the provider regarding his skin condition and the provider did not order any treatment. Nurse Riggs cannot order treatment, dkt. 46-2 ¶ 4, and she is entitled to rely on the doctor's decision. *Holloway v. Delaware County Sheriff*, 700 F.3d 1064, 1075-76 (7th Cir. 2012) (nurse is entitled to rely on doctor's order unless it is obvious the doctor's advice will harm the prisoner).

No reasonable jury could find, therefore, that Nurse Riggs was deliberately indifferent to that condition. She is entitled to summary judgment on Mr. Patterson's deliberate indifference claim based on her treatment of his skin condition.

### 2. GERD

When Nurse Riggs saw Mr. Patterson in March of 2020, he told her that he had been on chronic care for GERD for several years and that he was out of his medication. Dkt. 46-5 at 7-8. He further stated that he was "in pain all day and night" and that he had vomited. *Id.* Nurse Riggs considered his commissary purchases and told him not to purchase foods that would aggravate his reflux. *Id.*

Nurse Riggs argues that she is entitled to summary judgment because she did not have authority to order specific treatment for Mr. Patterson. Mr. Patterson argues that Nurse Riggs took no steps to help investigate or alleviate his reflux issues when he saw her in March and in May of 2020 and did not refer him to the doctor.

Considering the facts in the light most favorable to Mr. Patterson, a reasonable jury might conclude (1) that Nurse Riggs was aware that Mr. Patterson required prescription medication to treat his GERD but failed to refer him to a doctor to receive that medication, and (2) that Nurse Riggs therefore was deliberately indifferent to this condition. Nurse Riggs is not entitled to summary judgment on Mr. Patterson's claim that she failed to treat his GERD.

### C. Nurse Wolfe

Mr. Patterson alleges that Nurse Wolfe failed to provide him his prescribed eye drops and refill his Famotidine prescription.

### 1. Eyedrops

Dr. Lawton saw Mr. Patterson on February 5, 2020, and prescribed maxitrol eye drops. Dkt. 46-5 at 17; dkt. 60-1 at 376. But Mr. Patterson did not receive those eye drops until sometime in March. *See* dkt. 46-5 at 1 (stating that the eye drops were ordered in March). Nurse Wolfe asserts that she did not receive any health care requests forms from Mr. Patterson regarding any issue with his medication for his eye. Dkt. 46-3 ¶ 7. But Mr. Patterson states that he asked Nurse Wolfe several times for his eye drops. Dkt. 60-1 at 6 ¶ 40. He also points out that Nurse Wolfe updated his medical records on February 27, 2020, to indicate the order for maxitrol eye drops. Dkt. 60-1 at 57. Considering this evidence in the light most favorable to Mr. Patterson as the non-moving party, a reasonable jury might conclude that Nurse Wolfe knew, at some point between February 25 and March 11, 2020, that a doctor had ordered eye drops for Mr. Patterson, that, in fact, Mr. Patterson had directly asked her for those eyedrops, and that she did not dispense them. Finding these facts, a reasonable jury might conclude that Nurse Wolfe was aware that Mr. Patterson needed eyedrops for a serious eye condition but disregarded it. Nurse Wolfe is therefore not entitled to summary judgment on Mr. Patterson's claim regarding his eyedrops.

### 2. GERD Medication

Nurse Wolfe regularly responded to Mr. Patterson's requests for his GERD medication based on her review of the medical records. *See, e.g.*, Dkt. 60-1 at 43, 203; dkt. 2-1 at 13, 14, 20, 37; dkt. 46-5 at 30 dkt. 46-3 ¶ 10.

Mr. Patterson argues that when he requested a refill on March 1, Nurse Wolfe should have further investigated his issues. But the designated evidence reflects that, when considering Mr. Patterson's requests for his medications, she reviewed his medical records and responded based on her review. She did not have authority to change his medication orders, and she directed him to

14

request to be seen in sick call if he believed his orders were incorrect. To the extent that any of her responses were incorrect, Mr. Patterson has not designated evidence that would allow a reasonable jury to conclude that any error was the result of more than negligence. *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("[M]edical malpractice, negligence, or even gross negligence does not equate to deliberate indifference."). Nurse Wolfe is therefore entitled to summary judgment on Mr. Patterson's claims based on his GERD medication.

**D. Ms. Roberts**

Ms. Roberts works as a pharmacy technician, where she checks medications arriving at the facility and passes out KOP medications, among other things. Dkt. 46-4 ¶ 2. Ms. Roberts responded to several of Mr. Patterson's requests for refills of his GERD medication. In response to his April 14, 2020, health care request form, in which Mr. Patterson stated he was taking four tablets daily, she stated that the order was for one tablet daily. Dkt. 46-5 at 21. She later responded to a refill request stating that either he would receive it or the refill was sent to the outside pharmacy to be filled. Dkt. 46-5 at 19, 20.

Mr. Patterson argues that Ms. Roberts's response to his April 2020 request for a refill was inappropriate. But Mr. Patterson does not designate sufficient evidence to show that his medication order was for four times per day at that time. At most, Mr. Patterson's prescription at that time was for one tablet twice per day and therefore Mr. Patterson would not have been due for a refill when he submitted his request. Therefore, even if Ms. Roberts misread the records, this was negligence at most, and she did not have authority to provide him a refill. *See Johnson*, 433 F.3d at 1013. No reasonable jury could find Ms. Roberts was deliberately indifferent, and she is therefore entitled to summary judgment.

### E. Nurse Wright

Nurse Wright did not directly evaluate Mr. Patterson or provide him with medical care but responded to his grievance and healthcare requests.

When she responded to Mr. Patterson's first grievance regarding his Famotidine prescription, she noted that he was due to receive it soon. Dkt. 2-1 at 11. Then, when she received his health care request about his labs and eye drops, those were also promptly provided to him. Dkt. 46-5 at 1. There is no evidence that Nurse Wright was aware of any alleged delay in that treatment before she received the request. In other words, even if the lab test and eye drops were delayed, there is no evidence that Nurse Wright was responsible for, or even aware of, the delay. *See Colbert*, 851 F.3d at 657.

Then, when she received his June 2020, grievance, Mr. Patterson had received his Carafate prescription and the results of his biopsy showed that his skin condition was benign. Dkt. 2-1 at 4. Mr. Patterson argues that Nurse Wright should have more carefully reviewed his medical condition or his medical records in responding. But Nurse Wright is entitled to rely on the care provided to Mr. Patterson by his doctor and he points to no evidence to show that Nurse Wright disregarded any information that would indicate that Mr. Patterson was receiving inadequate treatment. *Holloway*, 700 F.3d at 1075-76. Mr. Patterson also makes several arguments that Nurse Wright violated Wexford policy, but even if she did violate policy, this does not, by itself, raise an inference that she violated his constitutional rights. *See Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017).

On these facts, no reasonable jury could conclude that Nurse Wright was deliberately indifferent to Mr. Patterson's conditions. She is therefore entitled to summary judgment.

**F. Wexford of Indiana, LLC**

Wexford is treated as a government entity for purposes of § 1983 claims because it contracted to perform a government function—providing medical care to state prisoners—and thus acted under color of state law. *Walker v. Wexford Health Sources*, 940 F.3d 954, 966 (7th Cir. 2019). Wexford "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by [its] employees. [It] can, however, be held liable for unconstitutional … policies or customs." *Simpson v. Brown County*, 860 F.3d 1001, 1005–06 (7th Cir. 2017) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690–91 (1978)). Mr. Patterson must show that "he was deprived of a federal right," and he must also "trace the deprivation" to a Wexford policy or custom. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. Nov. 10, 2021).

Here, the Court has determined that a reasonable jury might conclude that Nurse Riggs was deliberately indifferent to Mr. Patterson's need for his GERD medication and that Nurse Wolfe was deliberately indifferent to his need for his eye drops. But Mr. Patterson has not designated evidence that either of these potential constitutional violations resulted from a Wexford policy. While Nurse Riggs testifies that policy requires an assessment of commissary purchases to ensure an inmate is following a diet that does not aggravate GERD, dkt. 46-2 ¶ 8, Mr. Patterson must show that this policy "reflects a conscious disregard for a known or obvious risk of the constitutional deprivation." *Dean*, 18 F.4th at 237 (citation omitted). He has not done so here. There is no evidence that this policy required a review of commissary purchases without also providing other treatment or referral. No reasonable jury could therefore conclude that it is obvious from this policy that Nurse Riggs declined to refer Mr. Patterson to the doctor because of Wexford policy rather than her own individual conclusion regarding his care.

Mr. Patterson also asserts that Wexford's policy of requiring inmates to request refills of medications that should be refilled automatically violated his constitutional rights. The defendants explain that inmates are expected to request refills of KOP medications when they are about to run out of the medication. *See* dkt. 46-1 ¶ 14. Refill requests take about 48 hours to be processed and will not be processed if requested too early. Dkt. 46-7 at 7; dkt. 60-1 at 16. Mr. Patterson suggests that this means that every time an inmate requests a refill, he will go two days without his medication. Mr. Patterson had identified some incidences when his refills were delayed. *See* dkt. 2-1 at 17; dkt. 60-1 ¶ 20; dkt. 2-1 at 19. A reasonable jury might conclude that, if this is the case, Wexford has a policy that creates an obvious risk to inmate's serious medical needs. Wexford therefore is not entitled to summary judgment as to Mr. Patterson's claim that he experienced delays in receiving his refills.

Mr. Patterson also argues that Wexford has a practice of requiring inmates to submit multiple requests before seeing a doctor, but he does not designate sufficient evidence to support a conclusion that such a policy exists.[11] In fact, when he first presented to Nurse Riggs with growths on his skin, he spoke to the doctor right away. *See* dkt. 46-5 at 11-13.

Mr. Patterson further argues that he experienced a delay in seeing the optometrist because of Wexford's policy of requiring a nursing assessment before referral to a doctor. But Mr. Patterson does not show that Wexford's policy of requiring a nursing assessment was the "moving force" behind this alleged delay or that the nursing assessment requirement created a risk of an "obvious" constitutional deprivation. *See Dean*, 18 F.4th at 235, 237.

---

[11] Mr. Patterson cites to two affidavits from other inmates who testify that they, too, have experienced delays in doctor visits, prescription refills, and other treatment. Dkt. 60-1 at 407, 426. But those affidavits are too general to support a conclusion that Wexford had a systemic practice of denying the kind of care at issue here because those affidavits do not describe the delays that the other inmates experienced or show that such delays were unconstitutional.

Mr. Patterson also points to emails from Regional Medical Director Michael Mitcheff in which he encourages Dr. Byrd to reconsider the extent to which he prescribes "convenience" medications. Dkt. 60-1 at 327-341. But, even if this email demonstrates that Wexford had a policy of making medical decisions based on costs, there is no evidence of a connection between this policy and Mr. Patterson's claim that Nurse Riggs failed to refer him to a doctor or that Nurse Wolfe failed to refill his eyedrop prescription. In fact, when Mr. Patterson did see a doctor regarding his GERD, those doctors prescribed medication for it.

Finally, Mr. Patterson argues that Wexford violated Indiana law, but, again, even if Wexford did violate Indiana law, this is insufficient to support a conclusion that Wexford violated his constitutional rights. *See Estate of Simpson*, 863 F.3d at 746.

In short, Mr. Patterson has designated no evidence that Wexford had a policy that resulted in the deprivation of his constitutional rights beyond the claimed delay in receiving his refills. Wexford is therefore entitled to summary judgment as to the other allegations against Wexford.

## IV. Conclusion

The defendants' motion for summary judgment, dkt. [44], is **GRANTED IN PART AND DENIED IN PART**. The motion is **denied** as to Mr. Patterson's claim that Nurse Riggs exhibited deliberate indifference to his need for GERD treatment, his claim that Nurse Wolfe delayed in providing his eyedrops, and his claim that he experienced a delay in receiving refills because of a Wexford policy. It is, in all other respects, **granted**. The **clerk shall terminate A. Wright and C. Roberts as defendants on the docket**. The **clerk shall** amend the docket to reflect that defendant Wolfe's name is spelled Wolfe and that Wexford's name is Wexford of Indiana, LLC.

The Court sua sponte reconsiders Mr. Patterson's motion for assistance with recruiting counsel. That motion, dkt. 57, is now granted to the extent that the Court will seek to recruit counsel to represent Mr. Patterson for settlement and trial, if one is necessary.

Date: 3/23/2022

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

DEAUNDRA PATTERSON
197951
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All Electronically Registered Counsel